**SHEET METAL WORKERS' INTERNA-
TIONAL UNION, AFL–CIO, LOCAL
UNION 17, Plaintiff, Appellant,**

v.

**AETNA STEEL PRODUCTS CORPORA-
TION et al., Defendants, Appellees.**

**No. 6650.**

United States Court of Appeals
First Circuit.

Heard March 7, 1966.

Decided April 20, 1966.

Donald W. Fisher, Toledo, Ohio, with
whom Joseph F. Feeney, Boston, Mass.,
Mulholland, Hickey & Lyman, Toledo,
Ohio, and Feeney & Malone, Boston,
Mass., were on brief, for appellant.

Harold B. Roitman, Boston, Mass., for
United Brotherhood of Carpenters,
AFL–CIO, Local 33, appellee.

Oswald Vischi, New York City, with
whom Sidney O. Raphael, William T.
Glover and Raphael, Searles & Vischi,
New York City, were on brief, for Aetna
Steel Products Corporation and J. W.
Bateson Co., Inc.. appellees.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an action, brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., in which the plaintiff union (Sheet Metal) [1] seeks damages and a decree invalidating and enjoining enforcement of an arbitration award arising out of a jurisdictional dispute with defendant union (Carpenters). The dispute concerns construction work on the John Fitzgerald Kennedy Federal Office Building in Boston. Bateson is the general contractor and Aetna has a subcontract to install certain prefabricated and enamelled sheet metal enclosures surrounding window interiors.[2] The appeal is from a decision of the district court dismissing the complaint on the ground that the parties have provided for arbitration machinery to resolve the points at issue and that it is not for the court to interfere in what are essentially procedural questions to be resolved pursuant to the method agreed upon by the parties.

The seeds of dispute lie in the changing technology of building construction. Interior window trim and panelling were formerly of wood, had to be fitted and joined on the premises, and were therefore traditionally the domain of carpenters. But with the wider use of prefabricated metal, the skills and claims of sheet metal workers have entered the scene.[3] Aetna, the subcontractor, acting in accordance with its prior practice on jobs in six other states and the District of Columbia and in what it claimed was conformity to the tradition established by the 1928 inter-union agreement (see note 3, supra), assigned to Carpenters "all moveable steel partitions, convector covers, pipe covers, and related interior work around windows * * * for installation." On the other hand, Sheet Metal claimed that there had been a custom in the Boston area for convector covers and venetian blind pockets to be given to sheet metal workers (with no past area experience as to air induction covers, apparently a new item).

From these seeds sprouted a vine of controversy, running through all levels of the newly established arbitration machinery set up to deal with jurisdictional disputes in the construction industry. This machinery is set forth in the "Plan for National Joint Board for Settlement of Jurisdictional Disputes", an agreement between organizations representing the national building trades unions and building contractors, executed at the White House, and witnessed by the President on February 2, 1965. The Plan utilizes preexisting "Local Boards" for adjusting jurisdictional dis-

1. Sheet Metal Workers International Association, AFL-CIO, Local Union No. 17. Defendants are: United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Local Union No. 33 (Carpenters); J. W. Bateson Co., Inc. (Bateson); and Aetna Steel Products Corporation (Aetna).

2. The three items principally disputed over are (1) a convector cover with grilled facing which occupies the space between window sill and floor; (2) pipe or air induction covers, which cover wall ducts running between windows and also serve as window trim; and (3) metal facings at the top of windows covering pockets for the insertion of venetian blind fixtures. Assembled, the three items fully frame a window.

3. A 1928 jurisdictional agreement between Carpenters and Sheet Metal, still in effect, attempted to deal with this problem in allocating "all interior metal trim" to Carpenters, but apparently reserving metal trim made by certain sheet metal manufacturers for Sheet Metal. It also specified under what circumstances metal window frames would be set by each union. The agreement provided that in the event of a misunderstanding arising in carrying out the provisions, the two General Presidents would consult. This consultation apparently did not take place in this case but there is no averment that such omission affects the rights of the parties before us.

putes (in Boston, Chicago, and New York), establishes a National Joint Board for the Settlement of Jurisdictional Disputes, and creates an Appeals Board to decide appeals from both Local Boards and the Joint Board. It is empowered to prescribe rules and regulations subject to the approval of the Joint Negotiating Committee (representing the signatory organizations). The agreement took effect on April 1, 1965, by which time preliminary regulations for the operation of the Appeals Board had been established.[4]

Notwithstanding this framework designed to expedite orderly resolution of problems of jurisdiction, each step taken by the parties widened the area of controversy. The following chronology is the only matter not in dispute.

1. Sheet Metal, hearing of Aetna's assignment of interior metal window work to Carpenters, after an abortive effort to communicate with Carpenters, filed a protest with the Local Board in Boston. The protest cited only "The installation of metal enclosures on metal Venetian blinds pockets and convector covers."

2. Hearing was held on April 27, 1965. All parties except Carpenters (apparently having withdrawn, along with some other craft unions, from the Boston Board) were present. Sheet Metal, although it had listed only the "installation" of two items in its protest, allegedly made clear by pictures and a mockup model that it was claiming all three items described in note 2, supra. The Boston Board's laconic decision of April 27 was: "The work in question is the work of the Sheet Metal Workers."

3. Carpenters, alleging a delay in the mails, appealed the Boston Board decision to the Appeals Board seven days later. Sheet Metal objected that the appeal was untimely, not being within the two days set forth in Appeals Board regulations. The Appeals Board accordingly refused to consider it.

4. On July 2 Aetna notified Sheet Metal that it was complying with the April 27 decision by assigning installation of "metal enclosures on metal venetian blinds pockets and convector covers" to Sheet Metal. It was assigning installation of pipe covers (or air induction covers) and the unloading and distribution of all three items to Carpenters. This assignment literally complied with the wording of both Sheet Metal's initial protest and the Boston Board's order. (Aetna, in effect, was playing Portia to Sheet Metal's Shylock.) Sheet Metal, however, claimed this violated uniform custom that "handling" materials was included in "installation" and that it had been made clear that three items, not two, were in dispute.

5. Sheet Metal went on strike on July 15. The business manager of Sheet Metal, at the request of Bateson, went back to the Boston Board on July 20, orally requesting clarification of the April 27

---

4. The Procedural Regulations are prefaced by the acknowledgment that:

"The Appeals Board cannot anticipate at the outset of its operations the full range of procedural questions that may arise in carrying out its functions under the revised plan for the settlement of jurisdictional disputes. * * *"

The Regulations, contained, in part, the following:

"* * * The rejection of the consideration of an appeal by the Appeals Board is not to be construed as constituting any ruling on the merits of a dispute nor does it prejudice a further request for consideration of an appeal on a similar case in the future. * * *"

"* * * In exercising its discretion as to whether or not to accept a particular appeal, the Appeals Board will give consideration to such factors as the significance of the dispute, the frequency with which such disputes have arisen, the contribution a decision may make to the resolution of disputes and the improvement of relations, and the reasons advanced for considering the appeal. * * *"

"* * * The decision of the Appeals Board shall be communicated to all involved parties; its decision shall be complied with at once. * * *"

For other references to the Regulations, see notes 5 and 6, infra.

decision. No notice of this meeting was given Carpenters. The Board heard Sheet Metal, Aetna, and Bateson. It thereupon issued another Delphic decision that: "All of the parties in interest be directed to comply with the April 27, 1965 decision of the Board."

6. On this occasion there was a timely appeal to the Appeals Board by Aetna,[5] calling attention to the continuing work stoppage and the ambiguity of the July 20 decision. Carpenters joined, urging that "this entire matter" be reviewed to eliminate confusion. Sheet Metal questioned the right of the Appeals Board to intervene at all, and cited as the only area of contention the question whether "handling" of items is automatically included with assignment of installation.

7. Shortly thereafter, Bateson, to resolve the strike, made a written agreement with Sheet Metal to assign all the disputed work to it until the order of the Boston Board was reversed by a court, the Boston Board, or the Appeals Board.

8. After hearing all parties, the Appeals Board issued a decision on August 12 which, after reciting the "confused situation" resulting from the refusal of the Boston Board to clarify its earlier decision and to give guidance to the contractors, the work stoppage, the intervention of the National Labor Relations Board, and the "strained" interpretation which Aetna had given the April 27 decision, took the jurisdictional bull by the horns. Saying that "some definitive action * * * is long overdue to determine precisely how work shall proceed", it decided:

"The unloading, distribution and installation of convector enclosures comprised of sills and front pieces and grills shall be assigned to the sheet metal workers.

"The unloading, distribution and installation of pipe enclosures, curve window trim and base, filler pieces behind plastered columns, venetian blind pockets and metal partitions shall be assigned to the carpenters."

9. While this was a decision of the Appeals Board which by regulation was to "be complied with at once", Sheet Metal protested that the Appeals Board had jurisdiction only to decide whether the right to install items carried with it the right to unload and distribute them. Notwithstanding the absence of "protest" procedure after decision, the Appeals Board held another hearing on August 27 and rehearsed the entire history. While observing that "the unhappy events affecting this project in July clearly required some firm resolution", it urged that the Joint Negotiating Committee "review the type of circumstances involved" to clarify during this "formative period" the authority of the Appeals Board to consider an appeal having once declined to act, "in the face of subsequent developments of the sort" which had been faced in this case.

Plaintiff, Sheet Metal, argues that nothing done by the Appeals Board has validity because (1) it attempted to decide matters beyond the precise controversy referred to it; (2) having refused to take the first appeal, it was barred from rehearing the issue on the appeal from the "clarifying" decision; and (3) in any event its decision of August 12 was not final, being contingent on future deliberations of the Joint Negotiating Committee, and therefore the April 27 decision of the Boston Board should continue in effect.[6]

We do not agree. We have set forth the tortuous history of this controversy at some length partly to indicate the inappropriateness of an excessively legalistic approach to the technical and pragmatic problems of arriving at fair and workable jurisdictional solutions. For

---

5. Appeals Board Procedural Regulations provide that "An appeal may be filed from a job decision or a decision on a request for reconsideration, clarification or a decision following an oral hearing. * * * "

6. The Appeals Board's Procedural Regulations provide that a local board's decision shall be placed in effect, notwithstanding a request for consideration of an appeal, until such time as there is a decision by the Appeals Board.

example, Sheet Metal, which invoked the arbitral apparatus without any exploratory consultations with Carpenters, was embarrassed by a protest phrased too narrowly. The posture of Carpenters in pretending that the Boston Board did not exist was hardly conducive to constructive arbitration. While Sheet Metal was quick to foreclose an appeal several days overdue, it nevertheless was offended by an obviously "strained" reading of the April 27 decision by Aetna. Without probing other approaches, it resorted to a strike. Then, after going back to the Boston Board and opening the door to appeal, by requesting clarification, it tried to shut it once again as to all issues except one where it had nothing to lose. After the decision of August 12, the first thoughtful attempt to deal with the problem, it went outside all procedure, protested the decision, and obtained another hearing.

Our approach to this tangled web is based on the assumption that no longer in the building industry should jurisdictional problems be approached like common law pleading. We prefer to base our decision on what seem to us to be a necessary respect of and tolerance for the arbitration process.

It need hardly be stated that national policy strongly favors arbitration in labor disputes. The "Steelworkers Trilogy" clearly sets the tone. In United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403, the Supreme Court, criticizing the lower courts for their "preoccupation with ordinary contract law" compelled the submission to arbitration of even a possibly frivolous claim. In United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, the Court required the company to go to arbitration on its action in contracting out maintenance work despite a provision excepting from arbitration matters which were "strictly a function of management". The Court referred to a collective bargaining agreement as "more than a contract; it

is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." 363 U.S. at 578, 80 S.Ct. at 1351. It added: "Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties." 363 U.S. at 581, 80 S.Ct. at 1352.

In describing the scope of judicial review, the Court stated that inquiry " * * * must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." 363 U.S. at 582, 80 S.Ct. at 1353. The Court stated the restriction in another way in United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424: "When the arbitrator's words manifest an infidelity to this obligation [the collective bargaining agreement], courts have no choice but to refuse enforcement of the award."

We may observe that if such force is to be given to collective bargaining agreements between management and unions, no less support should be given agreements to which unions resort to resolve their jurisdictional disputes. There is no question here but that the dispute falls within the kinds of controversy envisaged.

Whether "handling" should accompany "installation"; whether metal enclosures on venetian blind pockets are one or two items; whether convector covers, venetian blind pockets, and air induction covers are indivisible or not; how, if divisible, they should be allocated—these are matters best handled by those acquainted with "the common law of the shop". The issue is whether, arbitration having aborted at the local level—with blame enough to be shared by all, the Appeals Board's decision should be declared a nullity for reasons of rejection of a prior appeal, scope of matters considered, and

a request to the Joint Committee for guidance for this type of problem.

We are reluctant to appear to preempt the responsibilities of both the Appeals Board and the Joint Negotiating Committee. We therefore will not say that, when the regulations allow an appeal from a decision on a request for "clarification", the Appeals Board is beyond the bounds of arbitrability in considering it. Sheet Metal cites the provision (see note 4, supra) saying that denial of an appeal does not foreclose an appeal "on a similar case in the future." From this, it concludes that an appeal is foreclosed on the same case in the present. But to say that because the Appeals Board will hear similar cases in the future, it will not entertain appeals from decisions on requests for reconsideration or clarification is to construe two regulations as having an internal inconsistency. Whatever the merits, it is clear that this is the kind of procedural question which should be left to the arbitrator (or, in this case, the system of arbitration) to decide. John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898.

Neither will we say that the Appeals Board was guilty of "infidelity" or abuse of power in trying to resolve a dispute by using a broader lens than that provided by the parties. If the purpose of the Appeals Board is to resolve disputes and improve relations between unions, we cannot deny it at least the same room for creative adjustment which an arbitrator between management and labor possesses.[7] Even appellate courts have power, on occasion, to note issues beyond those presented by the parties, in the interest of doing justice, e. g., Fed.R.Civ.P. 52. A fortiori, we should

not impose a narrowed latitude on what should be a broader-ranging search for a workable result. On a matter no less important to the parties we have said, "Questions of arbitrability are not automatically resolved in the employer's favor by invoking the term 'jurisdiction'. * * * Arbitrators, however, even as courts, Fauntleroy v. Lum, 1908, 210 U.S. 230, 28 S.Ct. 641, 52 L.Ed. 1039, have 'jurisdiction' to decide erroneously." Trailways of New England, Inc. v. Amalgamated Association, 1 Cir., 1965, 353 F.2d 180, 182.

The final argument against the validity of the Appeals Board decision is that, while it appeared to be final on August 12, any vestige of finality was removed by the subsequent reference to the Joint Negotiating Committee. Sheet Metal draws from this "state of suspended animation" the conclusion that it is entitled to have the Boston Board decision of April 27 complied with and the agreement with Bateson reactivated at least until such time "as a *bona fide* final decision is issued".

We have some sympathy with Sheet Metal on this point, for the Appeals Board has not made it crystal clear what it considers to be the state of its decision. Acting in obvious good faith it has sought to build confidence in its future operations by asking policy guidance for its action in "the type of circumstances involved in the present situation," so that any question of its authority be resolved. It would, we think, have been better practice to have made more clear the distinction between deciding a case before it and devising rules and procedures to cover anticipated situations in the future.

7. Cf. Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1499 (1959): "One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective bargaining process demand a common law of the shop which implements and furnishes the context of the agreement. We must assume that intelligent negotiators acknowledged so plain a need unless they stated a contrary rule in plain words." In the case before us, the procedures governing the processing of appeals by the Appeals Board, covering the building trades unions of the country, fill six pages of a vest pocket booklet.

The key to the answer, however, has been supplied by the cogent arguments of Sheet Metal itself. For counsel has pointed out that the Joint Negotiating Committee's authority is described as approving rules as to types of cases accepted for review and procedural regulations, not as interpreting or revising rules on its own initiative. We might add that, if the August 12 decision is to be considered a nullity, every case of first impression may well go unresolved. For if the Appeals Board cannot dispose of such a case, absent prior rule, it is all the more clear that a rule subsequently devised cannot operate retroactively. Such an approach would be well calculated to insure the demise of the "Plan". It is hard to believe that the signatory parties and unions represented would want their new system so reduced to impotency. On the other hand, the habit of going to court to test the propriety of every unprecedented or unforeseen step taken at any level in the arbitration system would " * * * entirely eliminate the prospect of a speedy arbitrated settlement of the dispute, to the disadvantage of the parties * * * and contrary to the aims of national labor policy". John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 558, 84 S.Ct. at 919.

Whatever may flow from the deliberations of the Joint Negotiating Committee, we think it clear that the Appeals Board decision of August 27 is the significant operative fact. It has not been revoked. It cannot be reversed by the Joint Negotiating Committee. At most the consultations may produce another decision, just as an appellate court occasionally reconsiders and changes its decisions. To be sure, if a different result ultimately ensues, there will have been much inconvenience suffered in the meantime, but no more so than granting Sheet Metal's request now, only to see the August 27 result reconfirmed at a later date.

We affirm the action of the district court in dismissing the complaint on the ground that "the parties have provided in their agreement for administrative decision of the very question which plaintiff now asks the Court to determine". But we have felt it necessary to examine the present status of the August 12 decision, for a decision buttressed solely on respect for the arbitration process not yet completed might be read as indicating that the Appeals Board decision was of no effect, and that the earlier Boston Board decision should be carried out. In other words, we have intervened only to support the arbitral jurisdiction.

The dismissal of the complaint must be affirmed for the reasons given in this opinion.